Robert F. McCauley (SBN 162056)
robert.mccauley@finnegan.com
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
3300 Hillview Avenue
Palo Alto, California 94304
Telephone: (650) 849-6600
Facsimile: (650) 849-6666

Jeffrey A. Berkowitz, Esq. (VA 65149 *pro hac vice*)
jeffrey.berkowitz@finnegan.com
Daniel C. Cooley, Esq. (VA 79565 *pro hac vice*)
daniel.cooley@finnegan.com
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
11955 Freedom Drive, Suite 800
Reston, VA 20190
Telephone:   (571) 203-2700
Facsimile:   (202) 408-4400

Attorneys for Defendant
GP STRATEGIES CORPORATION

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHART INC. fka MVE, Inc.,<br><br>                    Plaintiff,<br><br>          v.<br><br>GP STRATEGIES CORPORATION,<br><br>                    Defendant. | CASE NO. 3;14-cv-00097-BEN (DHB)<br><br>**GP STRATEGIES' MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS CHART'S ACTION FOR PATENT INFRINGEMENT AND TO COMPEL ARBITRATION**<br><br>Judge: Hon. Roger T. Benitez<br>Courtroom: 5A<br>Date:  May 5, 2014<br>Time: 10:30 a.m. |

# TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................... 1

II.  BACKGROUND ............................................................................................ 2

    A.  GP and Chart Entered Into An Alliance Agreement To Build
        Liquefied Natural Gas Stations ............................................................ 2

    B.  Under The Terms Of The Alliance Agreement, Chart And GP
        Agreed To Cross-License Their Intellectual Property And Arbitrate
        All Disputes ......................................................................................... 2

    C.  Chart Contravened The Alliance Agreement By Failing To Provide
        Its Response To A Request For Proposal For Tanks In A Timely
        Manner, Forcing GP To Select Another Supplier ............................... 3

    D.  Chart Sued GP For Patent Infringement Notwithstanding The
        License That Chart Granted GP To Use Its IP ................................... 4

III.  ARGUMENT ................................................................................................ 5

    A.  The Law Favors Resolving Disputes Through Arbitration And
        Congress Enacted the Federal Arbitration Act To Ensure That This
        Preference Is Honored ......................................................................... 5

    B.  Chart And GP Entered Into A Written Arbitration Agreement
        Making Disputes Such As This One Arbitrable ................................. 6

    C.  The Alliance Arbitration Agreement Bars Chart's One And Only
        Claim ................................................................................................... 7

        1.  All of the claims at issue in this case are covered under the
            arbitration provision ................................................................ 7

        2.  The Alliance Agreement's arbitration provision is
            mandatory once invoked, thereby requiring Chart to submit
            its dispute with GP to arbitration ............................................ 8

IV.  CONCLUSION ............................................................................................. 9

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*AT&T Technologies, Inc. v. Communications Workers of America*,
475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) ...................................5, 6

*Microchip Tech. Inc. v. U.S. Philips Corp.*,
367 F.3d 1350 (Fed. Cir. 2004) ...........................................................................5

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983)...................................................................................................5, 6

*Promega Corp. v. Life Technologies Corp.*,
674 F.3d 1352 (Fed. Cir. 2012) ...................................................................5, 8, 9

*Republic of Nicaragua v. Standard Fruit Co.*,
937 F.2d 469 (9th Cir. 1991) .............................................................................5, 6

*Simula, Inc. v. Autoliv, Inc.*,
175 F.3d 716 (9th Cir. 1999) ...............................................................................5

*Sparling v. Hoffman Const. Co., Inc.*,
864 F.2d 635 (9th Cir. 1988) ...............................................................................7

STATUTES

9 U.S.C. § 2.................................................................................................................5

OTHER AUTHORITIES

Federal Rule of Civil Procedure 12(b)(6)................................................................1

# I.    INTRODUCTION

Defendant GP Strategies Corporation ("GP") submits this memorandum in support of its motion under Federal Rule of Civil Procedure 12(b)(6) to dismiss the Complaint filed by Plaintiff Chart Inc. ("Chart") for patent infringement.  In 2008, Chart entered into an Alliance Agreement with GP, and in that Agreement Chart committed to arbitrate any dispute between the parties under the rules of the American Arbitration Association.   As Chart's allegations unquestionably — by Chart's own admission — relate to GP's performance under the Alliance Agreement, GP requests that the Court issue an Order dismissing Chart's Complaint and requiring Chart to honor its commitment to arbitration.

Although GP disagrees with the facts alleged in Chart's Complaint, in Paragraph 7 of the Complaint, Chart admits GP built fueling stations with equipment supplied by Chart during the term of the Alliance Agreement, which bears an effective date of July 15, 2008, and has a five year term ending July 15, 2013.  Chart further admits in Paragraph 8 of the Complaint that the process of building the fueling stations accused of infringement began in "mid-2013"— which was also during the term of the Alliance Agreement.  Yet through the same Alliance Agreement, Chart granted to GP a "non-exclusive, non-transferable right to use Chart's IP Material during the term of this Agreement for the sole purpose of performing the objectives of the Alliance under this Agreement."  The Agreement contains no relevant limitations on the scope of the term "IP Material," so this included the asserted '750 patent, or the objectives of the Alliance.  On the contrary, the Agreement's objectives include a broad one, "[t]o facilitate growth by each of Chart and GP through the pursuit of opportunities related to sales of LNG Fuelling [sic] Station-related products and services," and the Agreement requires broad construction of all terms and conditions consistent with the objectives like this.

Because the accused infringing activity — *i.e.*, the use, offer for sale, and/or sale of the fueling stations referenced in paragraph 8 of the Chart's Complaint —

occurred during the term of the Alliance Agreement, and Chart also agreed to arbitrate disputes arising during the construction, commissioning and up to hand-off of LNG fueling stations, the Court should grant GP's motion to dismiss in favor of the Alliance Agreement's arbitration provision.

## II.   BACKGROUND

### A.   GP and Chart Entered Into An Alliance Agreement To Build Liquefied Natural Gas Stations

GP is a global performance improvement company and a leader in engineering services.  Part of GP's expertise includes over ten years of experience designing and constructing liquefied natural gas ("LNG") fueling stations.  LNG is natural gas that has been cooled to minus 259 degrees Fahrenheit, at which point it changes to liquid form.  The LNG can be stored in purpose-built tanks that keep it at the appropriate temperature.  The LNG can then be dispensed from these tanks to power vehicles or for other purposes. Plaintiff Chart manufactures tanks for storing LNG along with other products for cryogenic and gas processing applications.

In July of 2008, Chart and GP entered into an Alliance Agreement.  Declaration of Michael Mackey, ¶ 3, Ex. 1.  Under the Alliance Agreement, GP was primarily responsible for constructing and installing LNG fueling stations and Chart was primarily responsible for constructing the storage tanks (also referred to as "vessels") and certain other components used in joint projects.  Declaration of Michael Mackey, Ex. 1 at §§ 1.2-1.4.

### B.   Under The Terms Of The Alliance Agreement, Chart And GP Agreed To Cross-License Their Intellectual Property And Arbitrate All Disputes

The Alliance Agreement covered various contingencies.  To avoid costly and wasteful disputes down the road, the parties contemplated and negotiated intellectual property rights up front.  Chart granted GP a comprehensive license to use all of Chart's "IP  Material," including its patents, to perform the objectives of the Alliance.

Case No. 3:14-cv-00097-BEN (DHB)

*Id*. at § 7.2.  GP granted a similar license to Chart.  *Id*. at § 7.1.  Both licenses survived expiration of the Agreement.  *Id*. at § 8.7.

In a further effort to avoid unnecessary expenses, the parties agreed to arbitrate disputes that arose from the Alliance Agreement:

> In the event a dispute under this Agreement should arise between the parties during construction, commissioning and up to hand-off of the LNG Fuelling [sic] Station to client for operation, the parties agree to meet promptly to attempt to resolve such dispute. If the parties fail to resolve such dispute within thirty (30) days after one party has notified the other party of such dispute and has requested a meeting to resolve such dispute, any party may commence arbitration under the rules of the American Arbitration Association.  Such arbitration shall be conducted in Los Angeles, California, by three arbitrators, one to be appointed by each party and the third to be appointed by the two arbitrators appointed by the parties. If the two arbitrators fail to appoint the third arbitrator within thirty (30) days of their appointment, any party may request the American Arbitration Association to make such appointment.  *Id*. at § 8.10.

The initial term of the Alliance Agreement was five years, from July 15, 2008, through July 15, 2013.  However, the parties contemplated the possibility of business relationships and arrangements that extended beyond the term of the contract.  The parties also adopted a "Survival" provision so that the IP licenses and the arbitration provision survive and "continue in full force and effect after any termination or expiration of [the Alliance] Agreement."  *Id*. at § 8.7.  Indeed, the Survival provision explicitly lists §§ 7.1-7.4, the IP provisions, and § 8.10, the arbitration provision, as provisions that survive expiration or termination of the agreement.

### C. Chart Contravened The Alliance Agreement By Failing To Provide Its Response To A Request For Proposal For Tanks In A Timely Manner, Forcing GP To Select Another Supplier

With the Alliance Agreement in place, the parties worked together to "offer and deliver an integrated mix of products and services" to prospective customers.  *Id*. at § 1.1(c).  Chart contends that in 2012, Chart referred GP Strategies to a customer to design and construct three LNG fueling stations.  GP designed fueling stations for this same customer and Chart supplied tanks and certain other equipment.  Several months

later, GP offered to build several additional fueling stations for this customer, and during the months of May and June of 2013, GP entered into a series of agreements with the customer to that effect. Declaration of Michael Mackey, ¶ 4. Each of these agreements was established during the term of Chart and GP's Alliance Agreement. These facts are consistent with allegations in Chart's Complaint at §§ 7 and 8.

GP requested that Chart provide a bid for the tanks to be used in the additional fueling stations for the customer. *Id.* at ¶ 5. The project had a tight timeline, and Chart failed to meet GP's needs in a timely manner and at a competitive price, forcing GP to secure tanks from another supplier pursuant to the Alliance Agreement's option to select a third party if "one of the parties is unable or unsuited to provide the product/service delivery and pricing required (e.g., cost, client preferences, specific functional knowledge, licensing or other factors)." Declaration of Michael Mackey, ¶ 5, Ex. 1 at § 3.7.

### D. Chart Sued GP For Patent Infringement Notwithstanding The License That Chart Granted GP To Use Its IP

Rather than attempt to repair its damaged relationship with GP by improving its services, Chart withdrew from the relationship with GP and filed a Complaint for patent infringement. But Chart's Complaint fails to address a critical issue: the existence of the Alliance Agreement and the IP license provisions. Put another way, even assuming that GP made, used, offered for sale, or sold a product covered by Chart's '750 patent, which GP did not, and even assuming that Chart's patent is valid, which it is not, GP cannot infringe a patent that Chart licensed GP to use. That is patent law 101.

GP's several efforts to negotiate a resolution to settle this dispute with Chart have been unsuccessful. Accordingly, GP demanded that Chart participate in arbitration and dismiss this action. McCauley Decl. ¶ 2 and Ex. 1. Chart has refused, forcing GP to file this motion to dismiss and compel arbitration.

### III. ARGUMENT

#### A. The Law Favors Resolving Disputes Through Arbitration And Congress Enacted the Federal Arbitration Act To Ensure That This Preference Is Honored

The Alliance Agreement's arbitration provision, because it involves interstate commerce and a patent license, falls under the Federal Arbitration Act ("FAA"). *Microchip Tech. Inc. v. U.S. Philips Corp*., 367 F.3d 1350, 1354 (Fed. Cir. 2004). Congress enacted the FAA to set forth its strong policy preference for resolution of disputes via arbitration. The FAA makes written arbitration agreements, such as the agreement in this case, "valid, irrevocable, and enforceable."[1] 9 U.S.C. § 2.

Courts addressing the FAA have consistently applied it to favor arbitration. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp*., 460 U.S. 1, 24 (1983) ("[Q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration."); *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir. 1999) ("The standard for demonstrating arbitrability is not high. The Supreme Court has held that the FAA leaves no place for the exercise of discretion by a district court, but instead mandates that district courts direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."); *see also Republic of Nicaragua v. Standard Fruit Co*., 937 F.2d 469, 475 (9th Cir. 1991). When performing this analysis "courts must recognize that the FAA 'establishes a national policy favoring arbitration when the parties contract for that mode of dispute resolution.'" *Promega Corp. v. Life Technologies Corp*., 674 F.3d 1352, 1356 (Fed.

---

[1] "A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

Cir. 2012) (citing *Preston v. Ferrer*, 552 U.S. 346, 349, 128 S. Ct. 978, 981, 169 L. Ed. 2d 917 (2008)).

**B.** **Chart And GP Entered Into A Written Arbitration Agreement Making Disputes Such As This One Arbitrable**

Chart cannot escape the simple fact that it entered into a written arbitration agreement with GP, and that GP has demanded arbitration. McCauley Decl. ¶ 2 and Ex. 1. And a written arbitration agreement creates a heavy presumption of arbitrability. *See AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (stating that "where [a] contract contains an arbitration clause, there is a presumption of arbitrability"); *Republic of Nicaragua v. Standard Fruit Co*., 937 F.2d 469, 475 (9th Cir. 1991) ("[A] district court has little discretion to deny an arbitration motion, since the [FAA] is phrased in mandatory terms."). Indeed, federal law establishes that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp*., 460 U. S., at 24-25.

The Alliance Agreement's arbitration provision is broad and unequivocal. It covers all disputes under the Agreement. Declaration of Michael Mackey, Ex. 1 at § 8.10. It is not limited to disputes regarding particular aspects of the Agreement, nor does it exclude any type of dispute. When parties employ a broad arbitration clause that doesn't exclude a particular grievance from arbitration, such as the arbitration clause in this case, "'only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail.'" *AT&T Technologies*, 475 U.S. at 650 (citations omitted). And that forceful evidence does not exist here.

The Alliance Agreement's various provisions confirm the parties intended for disputes, such as this one, to be resolved by arbitration. Indeed, the parties carefully set forth the location of the arbitration (Los Angeles California), the rules to be used (rules of American Arbitration Association), and the number (three) and manner of selecting the arbitrators (one appointed by each party, and the third appointed by these

two arbitrators).  Declaration of Michael Mackey, Ex. 1 at § 8.10.  The detailed nature of the Agreement's arbitration provision provides clear evidence of the parties' intent.

The parties also made their intentions clear by what they did not include in the arbitration provision.  The arbitration provision does not, for example, include any mechanism for litigation, either preceding or subsequent to arbitration.  Rather, the arbitration provision provides two mechanisms for dispute resolution.  First, the parties must attempt to resolve any dispute themselves, and after that, a party may "commence arbitration."  *Id*.  The arbitration provision clearly voices the parties' preference for dispute resolution outside of court.

The Alliance Agreement's written arbitration provision and its explicit terms confirm that the parties wanted disputes, such as this one, to be resolved by arbitration, and the court should give effect to the parties' agreement.

## C. The Alliance Arbitration Agreement Bars Chart's One And Only Claim

To determine if dismissal is appropriate, the court should determine whether the arbitration clause was broad enough to bar all claims.  *Sparling v. Hoffman Const. Co., Inc*., 864 F.2d 635, 638 (9th Cir. 1988) (affirming *sua sponte* dismissal of a complaint for failure to state a claim in favor of an arbitration mandated by an agreement even though defendant sought only a stay pending arbitration).  One way to show this is by establishing that the arbitration provision required the parties to submit all claims to arbitration.  *Id*.

### 1. All of the claims at issue in this case are covered under the arbitration provision

The arbitration provision covers all disputes, including patent disputes.  Chart's Complaint includes one claim for relief: "Infringement of U.S. Patent No. 5,682,750." Therefore, because patent disputes are covered under the terms of the arbitration

provision, and because Chart's Complaint only alleges patent infringement, Chart's action is resolved in its entirety under the arbitration provision.

The arbitration provision also covers Chart's patent claim from a timing standpoint. The arbitration provision has been in effect since the effective date of the Alliance Agreement, July 15, 2008, and remains in "full force and effect" to this date under the Agreement's survival provision. By Chart's admission, GP initially offered to build stations for the customer at the heart of Chart's Complaint during the term of the Alliance Agreement. (Chart's Mem. ISO Chart's Mot. for Prelim. Inj. at p.4 l.27 - p.5 l.5.) Additionally, GP entered into agreements to build the stations that form the basis for Chart's infringement claim prior to expiration of the Alliance Agreement — specifically in May and June of 2013 for the nine (9) fueling stations identified in § 8 of Chart's Complaint— all during the term of the Alliance Agreement and during the effective period of the arbitration provision. Therefore, the arbitration provision covers Chart's claim for patent infringement.

### 2. The Alliance Agreement's arbitration provision is mandatory once invoked, thereby requiring Chart to submit its dispute with GP to arbitration

Dismissal is also appropriate because GP has invoked the arbitration provision (McCauley Decl. ¶ 2 and Ex. 1), and the Alliance Agreement's arbitration provision is mandatory once invoked.

GP has sought to resolve Chart's dispute under the Alliance Agreement and those efforts have now failed. *See* Declaration of Jeffrey Berkowitz, ¶¶ 3-9. GP now seeks arbitration pursuant to a mandatory arbitration provision. The arbitration provision is mandatory because it states that "any party may commence arbitration" (Declaration of Michael Mackey, Ex. 1 at § 8.10), and then makes clear that, once the arbitration provision is invoked, "[s]uch arbitration *shall be conducted* in Los Angeles, California, by three arbitrators . . . ."). *Id.* (emphasis added). The arbitration

provision does not provide any mechanism to avoid arbitration after a party starts the process.

The parties' clause is similar to the arbitration agreement in *Promega*, 674 F.3d 1352. In *Promega*, the arbitration agreement did not require the parties to resolve all disputes via arbitration. *Id*. However, it did state that all controversies or disputes arising out of the agreement "shall" be submitted to arbitration once the arbitration provision was invoked. *Id*. The Federal Circuit concluded that the arbitration provision in *Promega* was mandatory and affirmed the district court's decision to compel arbitration. *Id*.

Because arbitration is mandatory now that it has been invoked by GP, and because it resolves the entire controversy raised by Chart's Complaint, the Court should dismiss this action and compel Chart to arbitrate its dispute with GP.

## IV. CONCLUSION

For the foregoing reasons, this Court should grant GP's Motion to Dismiss Chart's Complaint for Patent Infringement and compel Chart to arbitrate its dispute with GP.

Dated: March 31, 2014

FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP


By: /s/ *Robert F. McCauley*

Robert F. McCauley (SBN 162056)
robert.mccauley@finnegan.com
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
3300 Hillview Avenue
Palo Alto, California 94304
Telephone: (650) 849-6600
Facsimile: (650) 849-6666

Jeffrey A. Berkowitz, Esq.
(VA 65149 *pro hac vice*)
jeffrey.berkowitz@finnegan.com
Daniel C. Cooley, Esq.
(VA 79565 *pro hac vice*)
daniel.cooley@finnegan.com
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
11955 Freedom Drive, Suite 800
Reston, VA 20190
Telephone:     (571) 203-2700
Facsimile:      (202) 408-4400

Attorneys for Defendant GP Strategies Corporation

10

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing document has been served on March 31, 2014 to all current and/or opposing counsel of record, if any to date, who are deemed to have consented to electronic service via the Court's CM/ECF system per Civ. L.R. 5.4(d).  Any other counsel of record will be served by electronic mail, facsimile and/or overnight delivery upon their appearance in this matter.

By: s/ *Robert F. McCauley*
Robert F. McCauley